Good morning, Your Honors. My name is Richard Higgins. I represent Defendant and Appellant Dr. Clarence Winning. Given the ruling of the order of the court limiting 15 minutes aside and the fact that this is a consolidated appeal, Mr. Hanson and I have agreed to split our time, and I will attempt to reserve about a minute for reply. Dr. Winning's appeal is relatively simple, at least in the lion's share of it. And it is so simple that it actually doesn't require a whole lot of authority. Dr. Winning has been found liable for breach of contract in a case where the plaintiffs have conceded they didn't enter into a contract with him. They entered into a contract with J.V. Ventures, who is Appellant Winning. He in turn enters into a contract with Defendants Matz and Hamilton, and they send their wire to – they wire their money or their investment to Mr. Matz, who at that time was putting it in his attorney trust account. They admit no contract with Dr. Winning, yet Dr. Winning, at the end of a 35-day trial, was found liable for breach of contract. Dr. Winning's found liable for misrepresentation fraud, yet every plaintiff in this case conceded that Dr. Winning never made a representation to them. They were not induced to invest by anything he did, said, or acted on. Dr. Winning is found liable for conversion, yet the plaintiffs again admit that none of their money can be traced to Dr. Winning. And so, in this case, the plaintiffs are not liable for any of the things that the plaintiffs are not liable for. And so, the claimant's claim is that the money that Dr. Winning is holding goes to Mr. Matz's trust account. And where it goes from there – The conspiracy here, right? That's what we ultimately get to, is civil conspiracy. And so, isn't a conspirator in a conspiracy liable for the acts of his co-conspirators? If – yes, at a point. And we don't have a finding that I can see. There's no evidence to support that he is in a co-conspiracy with Mr. Matz and Mr. Hamilton. What we have left after the fiduciary duty, which, again, they don't have any relationship to create a fiduciary duty or accounting, we're left with civil conspiracy in RICO. You can't have civil conspiracy in a vacuum. There is no concert of action between Dr. Winning and Mr. Matz, Mr. Hamilton, Mr. Williams. There's no illegality on the part of Dr. Winning. He's not receiving the money. He's not controlling the money. He doesn't have an independent ability to commit the tort, which is what's brought up in our opening brief. And with respect to RICO, there's no predicate acts. So, what is exactly Dr. Winning's involvement? And I think this gets to Your Honor's question. Well, according to Matz and Hamilton, they've accumulated some $1.3 million, of which $250,000 belonged to the plaintiff, and it was their intent to send it off to some interbank debenture transaction. And they sent it to Mr. Ron Chambers, according to them, at the suggestion of Dr. Winning. And you have to realize that Matz and Hamilton are running this scam. It is clearly a scam. They have a history of running scams. They have a history of having money disappear into black holes involving other defendants, excluding Dr. Winning. Dr. Winning is a physician in Northern California who's befriended by Hamilton. And frankly, he appears to be the setup man. He is a guy that if the things go wrong and if they get sued and they're liable, then they can point to Dr. Winning and say, well, it was his buddy Chambers that we sent the money to. The fact of the matter is we don't have any actual evidence of any money going to Mr. Chambers. We take a look in the trial at Mr. Matz's trust account and we see $100,000 come in and $100,000 go out. We never see an accumulation of $1.3 million where he says, well, we were convinced to put this money into transaction number two. So Hamilton ends up being convicted during the course of the civil trial of criminal fraud. Matz, subsequent to this trial, is convicted. These are the con men that are running this operation. Dr. Winning is not. He is the fall man. He's the dupe. He's as big of a dupe as the plaintiffs in this case. And the fact of the matter is we have it. If Dr. Winning enters the conspiracy, well, then it's it's far after long after the contracts. It's long after the money is already out of of Matz's trust account. It's there is no conversion that we can see coming to Dr. Winning. All we have is is Hamilton and Matz saying Dr. Winning. It was his men in London. His he was the contact with Ron Chambers. Dr. Winning says, I have this guy. I gave him I gave the name to Mr. Hamilton. And that's the extent of it. I want to be sure I understand your argument. You're saying that going back to the conspiracy argument that Dr. Winning had no contractual relationship as a predicate for any kind of conspiracy. That's part of your theory, right? That's part of it. Now, conspiracy, however, can without a contractual relationship can still be based on his being part of a tortious course of conduct. But he has to have the independent ability to commit the tort. And he has no control over the bank accounts. No way to facilitate it. Well, I think that that's a true statement. But I don't see any evidence here where Dr. Winning is facilitating the tort. I don't quite understand. We say has been in a position to commit the tort. What do you mean by that? In the brief, we said there must be a capacity to commit the underlying tort. And in this instance, he is not involved in the representation for the fraud. He's not involved in any of the conversion. There's no tracing any of the money to any account that he controls or or is a beneficiary of. And so what we end up having is an individual who is pulled in by the con men on their side of the transaction, if you will. To be the fall man. This is the point. And this shows up in our Rule 52 motion that the Court has in the excerpts of the record. Dr. Mr. Matz initially represented Mr. Hamilton in an attempt to represent Mr. Dr. Winning at the same time. These are the con men, the convicted felons that vote down. The fact is the purpose of Dr. Winning in this transaction is to be on the side of that fall guy. And there is no evidence. And there's there's an admission by the plaintiffs. I don't have a contract with him. He didn't induce me. I didn't even know who he was till long after my money was gone and long after I knew there was a problem with it. I will submit to the balance of the issues based on the brief. But I would like to point out that the Rule 52 motion left us in a very unfair position. At the end of some 20 or 30 days of plaintiff's case in chief, plaintiff had rested. We brought a Rule 52 motion, which sounded a lot like this argument here. Well, there's no contractors. They've all taken a stand and admitted that they weren't induced by him. Let me have my Rule 52 motion. And the judge says to the extent that the plaintiff's focus or proceed on the first transaction, the transaction that apparently didn't occur. Then I'm taking it under submission to the extent that they proceed on the second transaction. The what I think is also of smoke and mirrors. It was one point three million going to allegedly to Mr. Chambers. Then I deny the Rule 52 motion. So I'm stuck now after some I think it was 30 days at that point of plaintiff's case in chief and plaintiff resting now having to proceed on a defense, not knowing if I have to proceed on a defense because at that point I should know what the focus of the plaintiff's case is. Is it on the first transaction or second? And so the confusion there, I think, did put us in a put left us in an unfair position where we had to go. I'll wrap up. We have read the brief. Believe me. Thank you. Thank you. Morning, Your Honor. Stanley has developed for the plaintiffs and appellees. Young's and Mack should be here from co-counsel. First, Mr. Zubel probably should. That's on the consolidated case. Well, they're being argued together. All right. All right. And that was dividing their ties. All right. It seemed more logical that way. Thank you, Your Honor. Roger Hansen, H.A. and S.O.N. of Santa Ana for the appellant Allen Williams and J.B. Ventures. This to me is a troubling trial level case and also a troubling appeal because I kind of rest my case on the exhibits 107, 108, 109, 110, which has been set forth in the supplemental or in the excerpts of record at page 340 and so forth of Dr. Winning. And those were contracts and the court can examine those contracts. Those contracts specifically said that this money was to be sent to the trust account of the Sterling Trust, which is handled by a defendant and not any longer an appellant, but J. Mr. Matz, who was an attorney in California's practice in Arizona. And that specifically spelled out what the money was to be released for if there was 100 percent, 107 percent bank guarantee, kind of like an FDIC, I suppose, guarantee on it. And only then was the money to be released. Now, Mr. Williams never, never knew what was going on between Dr. Winning and Hamilton and Matz on that weekend where that money was whisked out of the trust account and sent to England to an English barrister named Barry Phillips. Never knew that at all. And I think it's conceded by the plaintiff's attorney that that was never known to him. And it was almost like the barn door is open and the horse gets away. There's very little that ever could have been done by Mr. Williams to rectify that. And the district court seemed to take solace on the fact that there are some faxes and memorandums that were sent in late August and September and October, which were conveyed by my client, Mr. Williams, to the plaintiffs, which purported was quite involved in convincing these parties of the of the of the wisdom of this investment, wasn't it? Well, but but your honor, if that contract would have been adhered to, we wouldn't even be here because the money could never have gotten out of the trust account had it not been for the deposit of one hundred and seven percent bank guarantee. And that that is what I am saying. We are bound by we're bound by those contracts. And this thing never, never got into fruition to any investment. But there was no hundred and seven percent bank guarantee. That's true. And that's why the money was should never been released from the trust account. That's why my client is Mr. Williams was involved in convincing these people that investing in something that didn't exist was a good idea. I don't know what you mean, your honor, that doesn't exist. Well, there was there was no hundred and seven percent bank guarantee. The only now the hundred and seven percent bank guarantee would have to be in place before the money was ever released from the trust. But there isn't any bank that was going to give you one hundred and seven percent bank guarantee. Was there? Well, I don't know. The Federal Deposit Insurance Corporation, you know, gives a bank guarantee on one hundred percent of the money, up to one hundred thousand dollars. So the representation was that this money would never, never, never be released from this trust account unless that was in place. Now, that attorney, Mr. Matz, was obligated under the state bar rules to adhere to the conditions of release of money from that trust account. He released money for something totally nothing to do whatsoever. This matter, totally unconnected to this matter. And that's the troubling thing about this case. Had that not have happened, that's a violation of attorney trust. And I think counsel will concede that the state bar ponied up fifty thousand dollars, which is a limit that the state bar could put up for violations of Matz's trust account to the plaintiffs. So they got a fifty thousand dollars a piece of that, which indicates the bar was convinced that he did not adhere to the conditions of the trust account, why that money was put in the trust account. And that's that's what I really hang my hat on. And secondly, if I may move into the Rico issue in this case, I do not believe this is a valid Rico case. There was not a pattern of racketeering set forth in this case. Counsel seems to say that while there were two victims, he had two victims and there were a couple other so-called victims. Truly, Mr. Williams, he was from Utah and he had some dentist in the Salt Lake area that invested some money with him and so forth. But as counsel points out, we were fatal in trying to trace when this money actually was released from the trust account. There never was apparently a one point three million dollar transfer to England. It happened piecemeal. And all the efforts we made to find out how this was released and when it was released, it kind of went for naught. And I cited to to the court some additional cases which I'd like to have the court take a look at. There happened to be out of the fourth circuit. They're not that new. But I quote from one of them. This is H.M.K. Corporation versus Walsey. Eight. Twenty eight. Fed. Second. Ten. Seventy one. Four. Certain. Nineteen. Eighty seven. I quote. In fact, a great many ordinary business disputes arising out of dishonest business practices or doubtful accounting methods, such as have until the present been redressed by state remedies, could be described as multiple individual instances of fraud if one chose to do so. But to adopt such a characterization would transform, quote, every such dispute into a cause of action under Rico. Unquote. Our presidents have not adopted an interpretation of the statute producing such a result. And in my brief, I cite quite a few cases that interpret Rico and counsel has never countered any of them. Counsel simply says, well, there was multiple acts because there were multiple people invested in this plan. And there were multiple losses. And that constitutes Rico. I say that that does not constitute Rico. And I think that's another important issue. This case is whether this was a Rico case whatsoever at all. And I would agree with counsel that I don't see how Dr. Winning could get involved in a Rico matter, because I don't think they show that he was ever involved in any of this stuff at all. So I think the district court had a wrong concept of the scope of the Rico statute. And that's my second point on this thing is just that Mr. Williams was never, never able to counter what happened in this case. He felt that the trust account was sank or sank and the money that was placed in the trust account. He never handled it was sent to the trust account by the plaintiffs themselves. Never passed through his trust account or his office at all. And it was taken out of that trust account in violation of these contracts. And that's why I say that any liability of Mr. Williams should be set aside by this court reversed. Okay. Thank you. Morning, Your Honors, again. Sorry, I jumped on that. Stanley F. Zubel for the plaintiffs and appellees, Youngs and McNamara. With regard to the winning appeal, if you look at the entire case with winning, against winning, it does deal with conspiracy. It is civil conspiracy. There has to be an underlying violation of the law before it can be. Indeed. How can he conspire to breach a contract to which he's not a party? Well, counsel has referred to my conceding certain points. When it comes to the breach of contract issue, I can offer this court no authority for his contract liability. And you'll find that my brief does not address that point because I can find in any conspiracy context, no case where a co-conspirator is bootstrapped in under the contract. It's just not there. But I would suggest to you that Judge Brewster, in his 28 pages of settled findings of fact and conclusions of law, was very thorough in his analysis of what was done in this case, and specifically with regard to appellant winning. And what he found was that winning entered into a conspiracy with the named defendants to breach the investment contracts that counsel has referred to. He's found, for example, at page 32 of his findings, that winning joined an existing conspiracy to convert the investment funds of the plaintiffs. And he's also found that winning joined and assisted a conspiracy to defraud. And he also found at page 36 that winning violated 18 U.S.C. section 1962 sub D by conspiring to violate sub C. I believe it's black letter law that by participating in a conspiracy, a co-conspirator adopts as his own the torts of the other co-conspirators, and for that reason incurs co-equal tort liability. I underscore the point. Tort, again, admittedly conceding on the contract issue. I think in this fashion, winning became liable for all the preceding, concurrent, and subsequent torts committed by Mads Hamilton, Williams, and Durbin. Counsel has represented, and believe me, after 35 days of trial here, everybody, I mean, it turned into almost an evidentiary food fight, if you'll pardon the expression, and I've never seen a federal judge more tolerant of what went on in terms of allowing every party to present every conceivable bit of evidence in the case. Dr. Winning, it was shown by the evidence, was a mastermind at using SLCs, as it was called, standby letters of credit, to fund phony investment programs overseas using the trading of mid-term bank debentures. It was shown, for example, that back to 1995, he had contacts with defendant Williams, and they were, he introduced and schooled these individuals on the ins and outs and nuts and bolts of standby letters of credit, that you could somehow manipulate and create these huge yields. Never was it explained how these yields would develop. With the utmost of patience, Judge Brewster gave him every opportunity to come forward and explain, where is the standby letter of credit's functioning role in this process? Where is the mid-term, where's the bank guarantee, the 107 percent? It was an entire scam from beginning to end, and Dr. Winning was involved in the ground floor of this, dating back to 1995. In fact, the evidence, as I've indicated in the record, the supplemental record, shows that he was involved in a Worley Corporation investment that was identical to this particular loss, the M.O. using attorney trust accounts, shipping the funds overseas, and then they disappear. And this is almost classic in the type of scam that we're talking about here. So to say, and ultimately, he gets $42,000 for his effort. And if there's ever any simple piece of evidence, and we don't need to go into all the trial transcripts, I would just cite the court, that Dr. Winning's very own statement, given on August 4, 1996, which appears at Young's supplemental record at page 4. And I'm not going to read it. I've cited it in the brief. But to say that a transaction was coming down on the 26th of July, he's referring to the transaction of the Young investment. He says that, I informed you that I located the money. Is this a person? Is this a person who just happens to be a communications liaison with the people in Europe, trying to get the money back as a friend, as counsel reports he is? He says, you indicated to me that they were so responsive that we would be pleased in doing business with us, that the transaction would return five times their fund. This would give them an incentive for being patient. We were fortunate to obtain the $1.335 million in that it was earmarked for another transaction but was given to us because of my relationship with Scott Hamilton and knowing it would help me out of my present financial condition. You don't have to go much further than the two pages of admissions in his very own statement to show that he was very, very much more involved in this than simply someone who was asked to give some help to find money on the 26th of July. Winning, as far as I'm concerned, was a mastermind in the program and his relationships with these defendants go back. As to Williams, Williams did virtually everything in this case except participate in the actual loss of the money somewhere off in London. He solicited, he explained, he falsely represented. He had a prior history, as my brief indicates, of similar investment program solicitations of other investors. Forget about the $1.335 worth in this particular instance, but earlier in 1995 and in 1994, Williams is out there hustling people with the same M.O. Funds are being lost, put in attorney's trust accounts, chipped out and disappearing, and never traced. So he has the clearest, in my view, RICO exposure of any of them because he has such a track record of dealing with these kinds. He's a solicitor, an explainer, a liar, and a person who participated also in the cover-up. If you look at the record that Defendant Williams offers, there are perhaps 100 pages of faxes that Williams has sent as a delaying tactic, explaining that everything is fine after the investment has been made, failing to disclose the fact that they switched from the initial investment to a three-day turnaround where the money was going to double or triple, and continually telling these investors everything's fine, don't worry. He's keeping the lid on. His role at this point is to make sure that by the time that investors wake up, the money trail will be so cold that it will never be found, and that's what happened in this case. So I think that the evidence is clear as to both of these defendants. I'll submit on that point. I'll give each of you a minute to make a quick rebuttal. You don't have to take it if you don't want it. Thank you, Your Honor. I'll take about half of it, I hope. Your Honor, there's no evidence that Winning was ever aware of any contract between the plaintiffs and Mr. Williams or between Mr. Williams and Mr. Hamilton. The totality of the evidence is that on some Thursday evening, he gets a phone call from Mr. Chambers saying, would you like to invest in some program? Dr. Winning has a history of losing money, having sent it to Mr. Chambers, and he says, no, I don't have any money. And he says, would you think that Mr. Hamilton would be interested again? Well, you could ask him. And then he makes the contact, tells Mr. Hamilton, talked to Chambers. Ostensibly, they had done a transaction in weeks earlier where Dr. Winning believes he's introducing Hamilton to Chambers, and that's where the $20,000 comes from Hamilton. Hamilton says, thank you very much. Here it is. It's a way to get him locked in. They've already taken his money. And so with respect to the Worley Corporation, we have one gratuitous statement from the convicted felon Hamilton during trial where he says, oh. That's in your brief, too. I don't know. Thank you, Your Honor. Let's sit down. Just quickly, Your Honor, on the issue of the so-called Worley Corporation, that was one of the stickling things here, because I don't feel that they introduced any evidence that indicated this was a typical second scheme or preceding scheme that would bring this into the RICO picture. And that's the troubling thing about this. Okay. Ask the court to take a look at this. All right. Because I don't think it's a RICO case. All right. We have your arguments and your briefs. Thank you very much. The case is argued, will be submitted, and we will be in recess for the day. Thank you. Thank you.
judges: Fisher, Bybee, Mahan